Consolidation. We have three cases on the calendar this morning. One from the PTAB and two from district courts. One of the district court cases is submitted on the briefs and will not be argued. And so the first case consolidated is or are Caris MPI v. Foundation Medicine, 2020-18-87. Mr. Singer, will you begin with the 18-87 case with the three patents and then get to 660 with one? It's very nice to be back here in person. I have to say the last time I was here was arguing for the PTAB on this very case, the Friday before the world changed. In both of these appeals, the board and particularly Judge Flory, beginning with the foundational patents, the board made essentially the same error in applying the BRI standard, essentially as it were, emphasizing the B at the expense of the R, to yield a claim construction in the foundational patents that swept in the prior art that was criticized in the specification and in the CIP patent that was improved upon. With respect to the foundational patents, the board's ultimate construction did not take into account step B2 of the claims. Step B2 of the claims, each of the three patents, links the drugs that the system is looking at to the markers, the genetic markers. And those genetic markers, as was not disputed below, and as the board ultimately found, are lineage-independent. And by linking the drugs to the markers, you end up with a lineage-independent list of drugs. Mr. Singer, I'd like to ask you generally. Generating a report is not very inventive. Comparing data is not very inventive. The inventiveness here would seem to be clinical. I noticed with one of these patents, there are eight inventors, which seems very strange for an invention of this sort. But the invention would seem to be a recognition that a drug would be effective against a tumor, and that that was determined by the genetics, by the marker, not by the location of the tumor. And that would seem to be something determined by clinicians. Are all of your inventors doctors, clinicians, working in the laboratory? So on the, Judge Lurie, the eight inventors is on the continuation in part. The first, the foundational patents are invented by physicians. And the physicians, you have it correct that what they did was realize that, or determine through experimentation and also conceive, that it was improper, or improper, improper is not the right word, it was limiting to look only at the, or to continue 50 years of the same practice of looking at the quote unquote lineage, the site of origin of the cancer. So why do these claims read generating a report, rather than a method of treatment? If they were to be used for a specific drug, it's for a treatment of cancer. Generating the report, if you want, it's not reflected in the record. That was a 101 issue in the prosecution. Not surprising. That's where that came from. But with respect to the inventiveness aspect, you have to remember the claims are directed to any patient with any type of cancer. And so what the claims are regarding is looking at, we don't really care anymore, we the inventors, Drs. Von Hoff and Dr. Penney. We don't really care anymore what type of cancer that patient has, where the origin is. You just give me the tumor. I will look at the markers. We will run the markers. We will link those markers to drugs. Those drugs may be on-label, they may be off-label, but we will link those drugs to the markers. And from there, we will select for the patient. And that was an absolute paradigm change from what was done priorly as the director of the National Cancer Institute. Isn't that the discovery, though? Linking the therapeutic drugs to markers? I'm sorry? Isn't that the actual inventive moment? The linkage of the therapeutic drugs to the markers? It is, in respect to without the hidebound, if you will, prior paradigm of using the lineage of the cancer. But wasn't it known to already optimize treatments by looking at the molecular profile of a patient and based on the genotype, considering various therapeutic agents? Only within the lineage. So that's the prior art. So the prior art is prior use of markers. Okay, so that was known. But it was known in combination with considering cancer lineage. Right, exactly. And then this claim doesn't say anything about don't consider cancer lineage. It absolutely does in effect of its language, right? It doesn't use the words that the board was looking for. The board was looking for some proxy of that. But they didn't apply the actual language as written, Your Honor. But putting aside whether you can put a limitation into this otherwise very broad claim language, and we'll get to that in a second, what do you do about the whole list of things in the red brief where they explain that Receptin and Erbatoxin, all of those other products, did exactly what you're saying that prior art didn't know how to do? Your Honor, those were also looking within the lineage. If you look at those articles, you'll see. No, each one of them says, but not just for that particular cancer. They could also apply to other cancers. It applies to other cancers in the lineage. So if you look at those prior art articles, Your Honor, which were not, I'll make the point they're not part of a ground here. But if you look at them, you'll see they're sorted by disease. And so what they're still looking at, if this were lineage independent, they wouldn't be looking at the disease. They wouldn't care about the type of cancer that the patient had. They would simply be looking at the molecular markers. Well, the mere fact that they might have started by realizing it works well for breast cancer doesn't mean that they didn't also appreciate before the priority date that it worked well for other cancers. Well, I guess I disagree with that, Your Honor. What the articles are talking about in terms of the other uses of these drugs is, in fact, in the lineage. So if we will investigate Receptin in another cancer, and maybe it'll work in another cancer in that lineage. Not, we will investigate Receptin based on the HER2 marker in any cancer, in all cancers. I would ask the Court to think about, in terms of paradigm shifts, it's a significant and important shift here where the prior art looked at lineage. And yes, looked at lineage with markers. And then shifted from, we don't care about the lineage at all. We're going to just simply look at the markers, and we're going to test if we don't care if the cancer comes from breast, pancreas, etc. We don't even want that information. And then we're going to go and find whether or not the markers match up to the drugs, and that's the invention. That was the conception here. I'm concerned with whether lineage independence is in the claims. It was in the claims of a parent application and deleted, right? There was a, I think, yes. We don't, the phrase I think was single disease restricted that was deleted. And that's neither. And so why doesn't that carry through here? Because again, the board- Indicating what the inventors thought all that language meant. Well, the language is in the specification, and the Court's authorities say we have to look at the invention as specification. But if you simply apply the language in the claims- You can't ignore the claims. You can't ignore the claims. And you actually amended the language in the claims to take out what would have made it clear, or at least more clear. And I'm not asking at all to ignore the claims. And if you look, it's right in our brief. If you follow the language of the claims, whether you want to put the word lineage independent in there or not, you follow the language of the claims, the drugs are linked to the markers. The markers are lineage independent. Therefore, you get a lineage independent list of drugs. Just applying the words of the claim. And the board did not do that, manifestly did not do that. At page 827, for example, of the 350- So start with the claim. What language in the claim do you say specifically makes it clear that lineage independence is within the claim? Let me get the precise language. So it's step B2, Your Honor. In each of the patents, I'll just go to the 193 patents. I have it handy. Appendix 239, right? So step B2 is at least one computer database comprising, and then if you go to B2, a listing of available therapeutic agents for each of the plurality of the molecular targets, right? And those molecular targets are lineage independent. They're not associated with any particular type of cancer or one cancer. And so therefore, you get a list by necessity that is lineage independent. And that's what the board didn't do. They didn't take that step. They were looking for language. I understand that. And we deleted language in the file history. Gosh, I wish we had. It would have been a lot clearer, I suppose. But at the end of the day, the job of the court is to apply the language as written. And that's all we're asking for. And when the board got to step B2, it didn't apply it. If you look at their opinion, the board went right to the result, right? I guess what I'm wondering is, because this is an open-ended comprising claim, why can't there be a consideration of cancer lineage of a patient also considered and be within the scope of this open-ended comprising claim? Because the drugs, Your Honor, have to be tied to this lineage independent list of markers. You could do that too, but you still have to do that first thing. So if you were appending lineage dependence onto it, you'd still have to do the lineage independent analysis to generate the recommended therapy. So the fact that it's comprised shouldn't change the analysis. But the list is not limiting because you have the comprising language. The list is required, though, to be for each of the molecular targets. Those molecular targets right there, at a minimum, have to have the seven listed in the claims. And those seven, as the board found, and as wasn't disputed below, are lineage independent. So if you link drugs to a lineage independent list, you get lineage independent drugs. So you're saying that even if you put something, an input that's lineage independent, you could never have an output that's not? Let me see if I understand your question. If I use the system of the claim, could I get an output that was lineage dependent? No. You might get a result, Your Honor, that's on-label. So you might get a result that's on-label, but you wouldn't be selecting the drugs in an on-label, off-label paradigm. You'd be selecting the drug. Your answer is actually yes, but? No, I don't think so. I think to conflate the result of the claim, so to look at... Lineage dependent? It depends how you got there, Your Honor. If you end up, and I think that was in the Bisgrove study, if you look at the Bisgrove study, looking at things in a lineage independent way, choosing the drugs, I choose to treat this tumor based on the markers, and I use markers that are lineage independent. I might end up treating that tumor, let's just make it breast cancer. I might end up treating that tumor, the markers may say, use a breast cancer drug. The markers may say something as well, but that's very different. Looking at the output is very different than looking at the inputs that go in, and this is all about the inputs that go in. Did Bisgrove even use the claimed system? Bisgrove used the... That was a point of dispute below. The board found that Bisgrove didn't use the particular computer that it hadn't demonstrated, that particular computer, but absolutely used the lineage independent selection of drugs by looking at the tumors... Well, the particular computer is a particular limitation, right? It is, but the court's authorities in terms of secondary and district regard about the inventive aspect of the invention. The specification makes clear that the computer aspects are not the inventive aspect here. It's what we talked about at the beginning, the selection of drugs. The claim must include lineage independent situations, but you want it to preclude lineage dependent. You want it to be lineage independent only. I think it... Your Honor... Because otherwise we're in trouble with the prior art. Sure, sure. I think by operation of the words in the claim, it is lineage independent. If I have a lineage independent set of markers, and then I utilize and link the drugs to those markers so that I get a lineage independent set of drugs, and that's step B2 in each of the patents, I have a lineage independent system. The board said, yes, it could be lineage independent, but it also could be lineage dependent. That's the error that the board made. The board, if you look at, Your Honor, at page, for example, 827 of the 350, they said that... They looked at the output. It doesn't require the identification of all available therapeutic agents, including off-label. The board equated the result. I get to the result of an off-label drug as lineage independent. Those are two different things. Why don't you get to 660? Okay. Let me move on to the 660. Then we'll want to get to claim 12. Yes. With respect to the 660, I think I described at the beginning that the error was a similar nature in emphasizing the broadest aspect and not the, if you regard the more reasonable aspect. Again, the board was fixated on finding particular words in the claim and didn't focus on the claim language that was actually there. With respect to the claim, you're smiling. You're going to ask me a question. That's fine. The board focused on particular words but didn't look to the language. The absence of language, Your Honor. That's a little bit circular. They focused on the absence of words as opposed to the language that was actually there. Why is the language likely lack of benefit limitation in claim 12 even meaningful if you say it's already in claim 1? Because claim 12 is about the report, Your Honor. If you look at the language of claim 12, it's about generating a report. Both of them are about generating a report. And the report of claim 12 is different than the report of claim 1. The report of claim 1 only requires you report drugs that have likely benefit if there aren't. The report of claim 12 requires the additional reporting of a contraindication marker and the contraindicated drug. There's two different reports. That's all. That's why it matters. But you argue that claim 1 actually has a contraindication limitation. It has a requirement that you look at the information that is in the claim. The claim has multiple markers in the claim that only served a purpose at the time of the invention for contraindication, BRAF and PIK3CA. And the board's construction to construe likely benefit to encompass identifying drugs that wouldn't be of likely benefit because they were contraindicated is erroneous. That's the phraseology the board didn't apply with respect to claim 1. The board questioned whether a mutational analysis for some of these markers is absolutely required by this claim. Because this claim, it just very broadly says compare molecular profile test values with a corresponding reference value. And the way you would like us to read the claim is, okay, for some of these listed markers, you do one kind of analysis, a mutational analysis. For other markers recited in this claim, you're going to do a completely different kind of analysis. Is that fair to say? No, I don't think that's what we're asking. We're asking that the claims be construed at the time of the invention and the understanding of the person of skill in the art. But the comparison test for some of these markers is going to be of a different nature than the comparison test being done for other markers. The comparison test is going to embrace the mutational analysis for BRAF, for sure. Well, you want for a couple of these markers, the comparison to be a mutational analysis, right? I would say it would include the BRAF. For BRAF, it would include a mutational analysis.  No, you'd do a mutational analysis if that was available at the time of the invention. We're talking about in 2000, at the time of the invention. But I guess the relevant information you want to extract from these comparisons for these different markers is, one is you're looking at different levels of biological activity. Another one, you're looking for a mutation. And then if there is a mutation, then that would suggest some contraindication. For BRAF, I agree with you on that. So then that's why I'm saying you're asking us to understand this comparison step to be undertaking two different kinds of comparisons for these different markers that you've listed. I guess I don't agree, Judge Chen. I think that the comparison step is asking to compare. We're talking about the testing of the markers. BRAF only had utility at the time of the invention to indicate contraindication. And the comparison step simply is, is the marker, excuse me, is the drug indicated by a, if you will, overexpression or underexpression of the marker or mutation or not lacking mutation by the marker? Is the drug indicated? And then, is it contraindicated by a different marker? I.e., does it have likely benefit altogether? I see that I'm in my rebuttal time. I'm happy to keep answering questions. We will save it for you. Thank you. Mr. Wolf. Would you mind going backwards for just a second? Of course, Your Honor. In terms of the way your friend on the other side went. And I want you to address that last point with respect to Claim 12. Which last point specifically? About the contraindications. Yes, Your Honor. On the BRAF point specifically, I agree with His Honor about the different testing, but there's even a shorter route to the same result.  I'm going to pick one quote. The patentee said, One may find additional targets or molecular findings that can be exploited. And the board picked up on this and the similar quotes and said, and this is at A18, The 660 patent contemplates that the therapeutic agent database would be continuously updated as new agents and new associations are discovered. So they suggest to us that we must know that you are doing contraindication, as they put it, we would say likely lack of benefit, interrogation because of the presence of BRAF in the claim. When in the very patent they say, We may find new indications. We may find new likely benefits. Don't hold us to what exists now. We're going to find in the future that BRAF may be helpful, not just not helpful. And so this was important to the board. If you're going to say in your patent, Don't hold us to the state-of-the-art now, you're not held to the state-of-the-art for all purposes. I agree with his honor, but I think it's more fundamental than that. You can't draw the assumption that, prune or dive deep to say, Obviously they meant looking for likely lack of benefit. When they've told us in the patent, we're going to keep looking for benefits for all these different markers. So I think that's maybe the simpler route to the same point, your honor. Okay. Would you honor, prefer I start with the 1887 or the 1886 appeal? 1887, fine. Your honor, and Judge O'Malley, you asked a very important question, and I'm going to use Herceptin as the example. In 1998, Herceptin was approved for breast cancer based on HER2 overexpression. That was the insight. And at A6396 and elsewhere in the record, we see scientists, physicians saying, Aha, if overexpression of HER2 is important in this context, it might be important in other contexts. And so we see investigations, for example, of bladder and ovarian cancer. Now what counsel just did, and this has been a little bit of a frustration for us throughout the litigation, throughout the PTAP proceeding, the meaning of lineage independent seems to change from brief to brief, sometimes even from page to page, and even today we heard a different meaning. Because what counsel suggested is that that bladder or ovarian cancer that was reached because of not the breast cancer link, but the HER2 link at the genotyping link, that that is now, and I wrote this down, in that lineage. How is bladder and ovarian cancer in the lineage of breast cancer? I think he's saying there can be female related things, I guess. I hope that wasn't what he was suggesting. I think it's just that this is an amorphous concept that if scientists knew it well enough then we're going to kind of push it to the side and try to exclude it as a matter of prior. And if they didn't know it well enough, well, we're going to say we get credit for it. But fundamentally, your Honor's point was absolutely right, and both of your Honor's points about the underlying insight that we should be looking to the genotyping, the genetic markers, not necessarily to the cancer, the one original cancer. That was well known. We laid out five examples with Herceptin and Herbitux and Iressa and Gleevec. More generally, Dr. Spellman talked about, let me get this right, the Sawyer 2004 article that went into this in great detail, why you want to look at the markers. But why isn't there part of the prior art cited here, and maybe I've missed it, showing the activity of cancer agents against particular genotype aside from location of the tumor? I mean, if that was old, not very old, but effective prior art discovered by others than these inventors, why isn't that the issue here? Your Honor, we have Lew explicitly, and I hate to quote long quotes in court, but I think it's an important one. This is from A6878, so this is the lead prior art reference. The system of Lew, which otherwise is identical, the same steps, the same computer, the same database, the same interrogation, the system can be used to predict or identify the optimum drug for treating cancers other than breast cancer and can be used to identify optimum drug for treating virtually any disease for which there exists an established correlation between a patient genotype and the efficacy and toxicity of each group of drugs developed to treat the general condition. And what was the date of that? Lew was three years before the critical date, I believe. And critically, that's the magic language there, the patient genotype, not the patient's cancer type, the genotype. And then of course we get to Illumina, which is nothing but an assay of all of the relevant genotypes at the time, I believe 512, that number's off the top of my head. And so all the board did is it said you take Lew and then pre-critical date, you take the assay that is most contemporary at the time and you cover every single one of the markers and every single one of the claims. Whether or not you agree with the board's decision to eliminate cancer lineage independence or rather not to incorporate, I don't want to say eliminate, to not incorporate cancer lineage independence, even if you understand what that term means. And just to suggest the mischief of the term or the concept or the amorphousness or the fuzziness or whatever word you want to use, if you look at column 14, A237, in back-to-back sentences there is a different definition of what this concept is supposed to mean. On the one hand it says it's not previously associated with a specific disease. And then immediately above the table it says based on a cancer that has a known target that has an associated known drug. Isn't that the definition of something being previously associated with the disease? So again, I'm not sure where the line is drawn. With that, if there are no further questions I'd like to move on to the 1886 appeal, if I may, Your Honor. I'd like to point out that and particularly on claim 12 we're not exactly sure what the board thought likely lack of benefit meant. But we are sure why the board found or rejected the invalidity challenge to claim 12. This is from A21. The dispute over claim 12 focuses on whether the requirement that the report indicate a likely lack of benefit is satisfied with the prior arts disclosure indicating only that the value for markers fall within a normal range. That is the sum total of the dispute. What the board did, I think, is said we're going to equate likely lack of benefit with contraindication and then we're going to find that contraindication which isn't in the claim so we're going to construe a construction we're going to find that contraindication excludes normal readings and requires negative predictive biomarkers. Let me use a simple analogy to explain why we disagree with this respectfully. This is an oversimplification but I take Advil far too frequently given how much damage I've done to my knees through the years. Advil works by reducing inflammation. It may have others but let's simplify it by analogy. Advil works by reducing inflammation. If I run a report that says my inflammation levels are normal I now know that Advil is not likely to help that pain in my knee. There's another source, there's another problem there needs to be another solution. Depending on the context it is perfectly reasonable to say that a normal reading gives me important information. That's exactly the case with Herceptin and HER2. Herceptin works if the reason the patient has breast cancer is because of an overexpression of HER2. We understand your point likely lack of benefit in the most ordinary sense could include normal readings but the board appears to be understanding this term likely lack of benefit in the context of this patent, in the context of this disclosure and the fact that claim 12 talks about identifying yet another marker, identifying yet another agent and in the context of this patent it talks about repeatedly how you would do that when you discover some kind of contraindication and when it says contraindication what it means by that is determining that a given therapeutic agent that you would expect to work actually wouldn't work because perhaps there is some kind of resistance to it based on a mutational analysis. Therefore in the context of this patent likely lack of benefit means something particular and not so general. That's the hurdle you've got to get over. Your Advil hypothetical, I understand it but that hypothetical is divorced from the context of this patent. We have to read this claim inside the context of this integrated legal instrument. Understood, Your Honor. Let's start from first principles. The term says likely lack of benefit and I think we all know what that means in a vacuum. It means it's less likely to work or unlikely to work, whatever particular modifier you want to use. Is there anything in the claim language itself any surrounding language that narrows that that would exclude a normal indication as evidence that something is unlikely to work? I don't think the board or Keras has pointed to any claim language that would accomplish that result. You begin with the plain language and the dictionary definition of contraindication which means that it's not just not going to benefit but it's actually going to hurt. Contraindication is not in the claim language and it's odd that the PTAB kept swapping in that word. Intuitively, I think contraindication means something different than likely lack of benefit. I think it means it's affirmatively going to hurt you. That's my intuition. I'm not sure that's the board's intuition but that's mine. I think there is no reason to do this two-step that the board does. Likely lack of benefit, contraindication. Why does contraindication mean when contraindication doesn't appear in the claim? Contraindication isn't something we're being asked to interpret. Let's go back to likely lack of benefit and say what does the spec, what do the claims, what does the wrapper tell us about likely lack of benefit? I don't think we see any evidence in any of those three sources, the three things that we all grew up looking at that says likely lack of benefit shouldn't mean anything different. If I could go to the actual reference and look at figure 3B and this is at 27.77 This is the figure that's reporting normal values? Not just. I want to put this in the language of the claim. This is what the patentee is saying. This is an example of my invention. If I have GI cancer, gastric cancer and this report is wrong. This report tells me that Herceptin is unlikely to work but Gleevec is likely to work. Exactly what counsel just told us claim 12 requires the claim. CKIT we see as positive specific. I think they would acknowledge that this indicates a likely benefit. That's the prototypical case of their likely benefit as called for by the claims. There's a positive, there's an overexpression and so Gleevec would work there. We see up above Herceptin which we now know also treats gastric cancer through the same mechanism it treats breast cancer if there's an overexpression of HER2 we know that Herceptin would be a bad idea or at least not likely to work idea for gastric cancer based on this same report. Just to gild the lily here we see just below CKIT one of the other markers that's in the claims, EGFR which is also negative. What we're being told by this report is there are two normal readings that tell us don't use Herceptin and don't use Herbitux but do use Gleevec in the prior item in one page all in one place no combination necessary based on normal values. This patent I know it says contraindication and I know there's a general understanding of what that means but the way this patent uses the term contraindicate is a shorthand basically to mean indication of a resistance to a particular drug. If that's how they're using it and that's how they are describing what a lack of benefit or a lack of clinical benefit means in the context of this patent then why can't we understand the claim terminology of likely lack of benefit to mean basically a resistance to a particular therapeutic drug. That's an excellent point your honor if the term contraindicate had appeared in the claim then I think we could look to the specification and we could see that the gloss or the nuance or the connotation whatever you want to call it contraindication not just that something doesn't work because there's no inflammation but because it doesn't work because there's actually some conflict as it were again that's not a technical medical term but I think your honor understands my point if contraindication were the term in the claim we might have a closer fight and we'd have more of a textual analysis and then we'd be pointing you to suggestions like in column 51 where contraindicate seems to be used as a verb not a noun and we could have gotten into a much different discussion but they didn't choose to use the word contraindicate they chose to use the phrase less likely to benefit and that's a phrase that we all understand and there's no suggestion there's no IE there's no by that we mean anywhere that should change that common meaning what do you think figure 40B is illustrating and describing figure 40B the one that's identifying some therapeutic agents and then indicates at the top of the column lack of clinical benefit importantly about figure 40B of course your honor none of the identified markers are in figure 40B in that context your honor if I could find it I'm sorry there's too many pages here you're having a common problem yes your honor so figure 40B is one of the set of reports that are exemplars from the patent if we look at 40B there is not a single and we see the heading lack of clinical benefit which is still a third term close to likely lack of benefit there is not a single reference to any of the markers at issue here so there's nothing to be gleaned one way or the other second thing I'd say about figure 40B biomarker column those identified markers are different from the recited markers yes your honor I believe there's one overlap in the previous with clinical benefit the C-kit I believe C-kit is the only overlap and counsel will correct me if I'm wrong but I believe that none of those starting with MGMT down in figure 40B I believe none of those are in the claim the other thing I'd note is many of these reports are not called for in the claims the reference is exemplary but most fundamentally the specific examples they give show that there is an increase in expression over expression there's no dispute that an under expression the patent office wouldn't suggest that an under expression can satisfy the claims and there's no under expression in this either so we're at risk of over reading over reading the import of figure 40B if we say anything can be made from the fact that all of the exemplars are indicating likely lack of benefit because of over expression did my answer not satisfy your honor I think what you're suggesting is that there's something that may be read questioning whether something could be read that all of the exemplars in 40B of likely lack of benefit the result is an over expression of the given gene or protein is that understanding roughly what you're asking I'm trying to figure out if 40B is enough to suggest lack of benefit should be understood to be resistance to a drug your honor I don't think it is one it doesn't have anything to do with the particular markers so the fact that these markers are resistant I understand the specifics but I'm talking more about the concept of how this patent understands lack of benefit your honor I think that this patent understands likely lack of benefit to mean the drug won't work or is less likely to work or is unlikely to work what would that be in the specification your honor that's tricky because it doesn't actually use that phrase but if you look at column 51 the candidate treatment selected I'm sorry what line are you on starting at 46 as a non limiting example molecular profiling might reveal that the EGFR gene is amplified or over expressed thus indicating selection of a treatment that can block EGFR activity it goes on to simply say does it succeed in solving the problem there's no suggestion in that paragraph the bottom of that same paragraph starts talking about around line 59 molecular profiling may also reveal that some or all of these treatments are likely to be less effective for example patients taking G or E eventually develop drug resistance mutations in EGFR accordingly the presence of a drug resistance mutation would contraindicate selection of the small molecule kinase inhibitors so this right here is right in line with my working understanding of what this patent is describing your honor that is an example of how a drug might fail but there's no suggestion that is the only example of how a drug might fail again there's no the invention is there's no lexicography there's no disclaimer and so the fact that there are exemplars that would support it doesn't mean that we should exclude it with that your honor I'm not looking for further questions I'm deep in my rebuttal time one last question how should claim 12 have been written to capture the actual thought that they invented and disclosed I think it was written to capture I don't think there's anything in this patent take a step back what counsel suggested the invention was look at the particular biomarker and based on that biomarker the comparison of the normal to the patient and based on what you know about the drug the available therapeutic should you or should you not use it is it likely to be effective or likely not to be effective and there are lots of different reasons why a drug might not be effective and I don't think they wrote this think about it the other way imagine if we were in court arguing non-infringement because although our system spits out a report that does exactly what the claim says and says don't use Herceptin it is not likely to be effective is the answer that they should have written in once you identify a resistance to a drug something like that your honor Mr. Wolf we will save 4 minutes Mr. Sanger you have 5 minutes Mr. Sanger you have 5 minutes  Mr. Sanger you have 5 minutes I want you to start there too everyone in America knows that whether Her2 negative or Her2 positive the question is does Herceptin help you not is it going to hurt you the question is is it going to help you so that is why I don't understand how you can say that likely lack of benefit means the same thing as a contraindication so I was going to pick up right where counsel left off we looked at 40B and 40A but we didn't look at 40E figure 40E your honor that actually does have one of the markers in the claim that is easy to spot we all apologize for the blurriness of this but if you look at A166 it answers the question here with respect to for example P10 in the middle column about the 10th line down you will see P10 which is one of the claimed markers and it describes it as no change counsel's argument was that no change tells you information about whether something is likely to benefit or not likely to benefit and yet P10 which is no change the normal result or whatever it is is not listed if you will on figure 40B as a likely lack of clinical benefit that is the concept that the claims require something is in fact resistant something that was indicated or might be indicated for the patient based on one marker is then contraindicated by the resistance of another that is what the board construed so why wasn't the word contraindicated used? the word contraindication does not appear in the claims it does not appear in the claims but it is used in the phraseology of these reports the 40A and 40B, clinical benefit likely lack of clinical benefit and 40E tells you what was tested as does 40D I believe as well and it tells you when there is no change which is what the board found it doesn't list it as likely lack of clinical benefit because you are looking for that resistance to something that was already indicated everything you just said might be consistent with how you want us to translate likely lack of benefit but it doesn't tell us why we must think of likely lack of benefit in that way what is it about this patent that demands us to construe this rather broad vague language to be about resistance to drug mutation, contraindication whatever you want to use to swap in for likely lack of benefit the concept in the specification that we have gone through the specification repeatedly describes the invention as using that concept of contraindication in the comparison step it doesn't use the word it has exemplar reports which use phraseology it is very close to what is in the claims likely it uses clinical the phraseology in the figures is very nearly the same phraseology in the claims the phraseology in the figures should govern the phraseology in the claims where there is support in the specification which the board also found the discussion about column 51 with respect to equating the word contraindicate to something where it is a resistance does that answer your question? what column is that where you equate? if you look at column 51 Judge O'Malley counsel went through that with Judge Chen describing if you look at line 58 continuing with the exemplary embodiment profiling may also reveal that some or all of these things this goes back to the whole notion of that is using contraindicate as a verb  you are asking whether it is equated to resistance that is how I understood your question here they are talking about contraindicate the selection that is using contraindicate as a verb to contraindicate something that already has been indicated contraindicate the selection meaning don't bother to go there that is very different from the common understanding meaning of contraindication with respect to medications it is different to the extent we are arguing about the construction within the construction the board construed lack of benefit to require this contraindication concept as used in the patents not the medical use of the terminology that is not what the board was talking about this patent basically hijacks the word contraindicate and uses it in a different way it does I don't think there is anything wrong with that to use the word in a different way than what someone might use it that is different than don't use this it is contraindicated for a medical reason finally with respect to I just want to say one last word about the prior art use that was raised in the Bonhoeff, the charts, the negative and the no change I couldn't quite tell if there was an argument in the briefs this wasn't considered by the board it absolutely was considered by the board the petition for IPR equated figures 3B and 3C the board quoted the petition equating the two as no change to the extent that was an issue I wasn't quite sure from the argument where there was a distinction being made between no change and negative that was equated before the board in the petition and the board cited it as having considered both of those figures does CARES have any patents or continuations off of these specifications that use words like contraindicate or resistance to a drug or without considering cancer lineage or any of that I'm talking about both appeals there is a patent that relates to off-label your honor the non-disease specific agent but there is not something that talks about non-disease lineage or outside the lineage those kinds of concepts or phrase contraindication this is how CARES claimed it you have a claim that says non-disease specific you have a claim that says something like non-disease specific agent, which is defined as an off-label agent any other questions claim 12 is asserted in the litigation it is thank you counsel very briefly your honor the opening brief in the 1886 appeal footnote 2 page 8 CARES said there was much debate before the board as to the meaning of the word contraindicated as used by doctors as the record reflects, the word can mean something far more serious to doctors than its use in the 660 patent specification as meaning lack of efficacy that is how they told us that contraindication should be understood essentially synonymous with likely lack of benefit without all of the gloss that they have tried to import about resistance or the battle I was describing earlier emphasizing that point if we go to A197 51 roughly line 31 there is a series of exemplars of how this can work the best evidence can be used as the basis for a rule the simplest rules are constructed in the format of if biomarker positive then treatment option 1 else treatment option 2 a neutral natural normal result that gives treatment option 2 specifically called out in the specification consistent with the plain meaning of claim 12 respectfully the PTAB did everything right here except over reading the meaning of likely lack of benefit in claim 12 thank you for your time your honors and it is wonderful to be back live thank you to both counsel and the expectation on this occasion